# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2022

Lyle W. Cayce
Clerk

No. 21-50776

Rogelio Barron, *individually and on behalf of* Anthony Barron, *deceased*; Maria Barron, *individually and on behalf of* Anthony Barron, *deceased*,

*Plaintiffs—Appellants*,

*versus*

United States of America,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CV-1184

Before Stewart, Clement, and Elrod, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

The parents of decedent Anthony Barron appeal the district court's ruling that it lacked jurisdiction under the Federal Tort Claims Act (FTCA) to hear their claim. For the reasons discussed below, we REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.

No. 21-50776

I.

Camp Bullis is a 28,000-acre military training base outside of San Antonio, Texas.  About 90 miles of road run though Camp Bullis, including Wilkerson Road.[1]  Part of Wilkerson Road has a low water crossing on a flood plain with a gate to block the crossing.

On October 30, 2015, beginning in the early morning, Camp Bullis experienced heavy rain.  That day, two officers were responsible for inspecting the low water crossings in Camp Bullis (including the one on Wilkerson Road) for flooding.  The officers began by inspecting Camp Bullis Road, which they closed.

That same morning, Anthony Barron, a civilian contractor, was driving to work in Camp Bullis.  It is likely that Barron saw that Camp Bullis Road was closed and chose to take Wilkerson Road instead.  The gate on Wilkerson Road was open.  Barron tried to traverse the low water crossing in his vehicle but was swept away and ultimately drowned.

Barron's parents sued the United States.  They claimed that the United States failed to: (1) inspect, close, and lock the gate, or otherwise restrict access to the low water crossing; (2) warn Barron of potential flooding; and (3) install guardrails that may have prevented flood waters from sweeping away Barron's vehicle.  The United States moved to dismiss, arguing that the claims were barred by the discretionary function exception to the FTCA.  The district court granted the government's motion, holding that it did not have jurisdiction because the government was exercising a discretionary function.  Barron's parents filed a motion to amend the judgment expanding on earlier arguments regarding the government's duty

---

[1] Wilkerson Road was previously unnamed.

to inspect, close, and lock the gate, or otherwise restrict access. The district court denied this motion. Barron's parents appealed on the grounds that the decision to close and lock the gate did not fall under the discretionary function exception.

## II.

Questions of sovereign immunity and subject matter jurisdiction are reviewed *de novo*. *Gonzalez v. United States*, 851 F.3d 538, 542–43 (5th Cir. 2017).

## III.

The FTCA waives the United States' sovereign immunity in tort claims brought against any government employee acting in the scope of his employment. 28 U.S.C. § 1346(b)(1). But sovereign immunity is *not* waived if the government employee is "perform[ing] a discretionary function or duty on the part of a federal agency." *Id.* § 2680(a). Two conditions must be met for this exception to apply. First, the conduct in question must be "discretionary in nature." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Second, the conduct must be "of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23 (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

## A.

The first question is whether closing and locking the gate was "discretionary in nature." To be discretionary, an action must involve "an element of judgment or choice." *Id.* at 322 (quotation omitted). A function is not discretionary if a government regulation requires a particular action because, in that case, "the employee has no rightful option but to adhere to the directive." *Id.* (quotation omitted).

The key provision at issue here is Camp Bullis regulation 350-1, § 2–3(d), which provides that "[a]ll Range/Control Area/Impact Area gates will either be locked or guarded by the unit using the area." The government argues that the phrase "by the unit using the area" modifies both "locked" and "guarded," so the regulation can be properly interpreted to mean that "the gate must be locked by the unit using the area." In the government's view, because it was not required that the gate be always locked, choosing to lock the gate was discretionary.

The district court agreed with this interpretation: "[u]nder conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" Order Denying Motion to Amend Judgment at 9, *Barron v. United States*, No. 5:18-CV-1184 (W.D. Tex. July 13, 2021) (Dkt. No. 65) (quoting *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021)). The district court noted that other indicia of meaning support this interpretation. For example, because there is a shooting range beyond the gate, it follows that in the interest of safety the gate would need to be locked only when the range is in use—when there is a "unit using the area."

But that is not the most natural reading of the regulation. Interpreted properly, the phrase "by the unit using the area" modifies "guarded," but not "locked." Therefore, the regulation provides that either the gate must be "locked," *or* it must be "guarded by the unit using the area." *See Barnhart v. Thomas*, 540 U.S. 20, 26–28 (2003). The Supreme Court provided an instructive example on interpreting provisions like this one:

> Consider, for example, the case of parents who, before leaving their teenage son alone in the house for the weekend, warn him, "You will be punished if you throw a party or engage in any other activity that damages the house." If the son nevertheless throws a party and is caught, he should hardly be able to avoid

> punishment by arguing that the house was not damaged. The parents proscribed (1) a party, and (2) any other activity that damages the house.

*Id.* at 27. This textual analysis is further bolstered by the absence of a comma after the word "guarded." As the district court noted, it is more likely that "by the unit using the area" modifies both "locked" and "guarded" when "a comma separates the antecedents from the modifier." There was no comma here, further indicating that "by the unit using the area" modifies only "guarded." Therefore, because there was no unit using the area in the early hours of October 30, 2015, the gate was *required* to be locked.

Other rules regarding the gate buttress this interpretation. Regulation 350-1, § 2–3(a) provides that the area beyond the gate is to be "marked by warning signs and/or locked barriers"; those who wish to access the area "must report to Range Control and coordinate the reason, destination, and routes to be used prior to their being allowed entry"; and "[u]nauthorized entry is a federal offense and those apprehended will be prosecuted" (there is even a sign affixed to the gate that reads, "NO TRESPASSING. VIOLATORS WILL BE PROSECUTED."). Section 2–3(a) also provides that "[e]ntry into the [area behind the gate] is strictly prohibited without Range Control permission and possession of a key does not in any way imply free access." These rules indicate that securing the area behind the gate was of great importance, and that locking it was therefore required. For safety purposes, it is not surprising that the gate preceding a shooting range must be locked at all times, even when a unit is not in the area, especially because "units train[] and shoot live rounds 'at all different hours . . . almost in all weather conditions . . . to simulate combat conditions.'"

Testimony further suggests that locking the gate was not discretionary. Five witnesses indicated that the gate was normally locked. Of course, just because the gate was "normally" locked does not itself prove

that locking the gate was mandatory.  But just because it was open from time to time similarly does not make unlocking the gate discretionary.  After all, there were times when the gate was supposed to be open.  As one witness put it, the road served as a "limited-use access point to the ranges for certain individuals."  Another witness noted that the gate could be opened to let through sanitation workers with heavy equipment.  This just goes to show that the *default* position of the gate was to be locked—even more indication that locking it was nondiscretionary.

Considering other regulations around the gate, testimony, and, most importantly, the text of the regulation itself, locking the gate was not discretionary.  For this reason, the discretionary function exception does not apply, and the FTCA has waived the government's sovereign immunity.

Because the government is required to meet both conditions for the discretionary function exception to apply, we do not need to assess whether the conduct here was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23.

* * *

Because the discretionary function exception does not apply, we REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.